UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. CLAYTON FENT, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>L-3 COMMUNICATIONS AERO TECH LLC, et al., )<br>)<br>Defendants. ) | Case No. 05-CV-0265-CVE-SAJ |

**OPINION AND ORDER**

Now before the Court is Raytheon Company's Motion to Dismiss (Dkt. # 44). Clayton Fent ("Fent") filed the instant qui tam action, alleging violations of the False Claims Act, 31 U.S.C. §§ 3729-3732 ("FCA"), and wrongful termination under Oklahoma law. Dkt. # 2, at 8-10. Defendant Raytheon Company ("Raytheon") now moves to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). For the reasons set forth below, the Court finds that the motion to dismiss should be **granted**.

**I.**

The instant action arises from the conduct of L-3 Communications Aero Tech, LLC ("L-3"), formerly known as Raytheon Aerospace, LLC.[1] A subsidiary of defendant Raytheon divested all but 26.5% of its interest in L-3 in June 2001. Dkt. # 45, at 2 n.2. Thereafter, in 2002, L-3 received a delivery order pursuant to a service contract with the United States Department of Air Force

---

[1] L-3 Communications Aero Tech, LLC purchased Raytheon Aerospace, LLC during 2005. Dkt. # 42, at 2 n.1. The conduct alleged in the complaint occurred prior to the acquisition. Id. For the purposes of this Opinion and Order, the Court will refer to Raytheon Aerospace, LLC as L-3, its current name.

("United States"). Dkt. # 45, at 2. The delivery order required L-3 to service and repair military helicopters in the Middle East and Southwest Asia, for which L-3 would be reimbursed for per diem payments made to employees working under the service contract. Dkt. # 2, at 2. L-3 sent employees, including Fent, to Kuwait to fulfill its delivery order obligations. Id.

Fent worked for L-3 from February 22, 2000 until his termination on May 16, 2003. Id. at 3. On March 1, 2003, Fent departed for Kuwait. Id. at 4. As an administrative aide, Fent's job duties included "completing and ensuring the accuracy of payroll, per diem reimbursements, employee insurance forms, employee income tax submissions, leave of absence applications, accident reports, and other personnel related submissions." Id. at 4, 7. On a weekly basis, Fent submitted to L-3's payroll department a report reflecting the amount of per diem reimbursement due to each employee. Id. at 5. In this report, Fent recorded for each eligible employee the proper site code, delivery order code, and number of days worked during a given week. Id. Based on the codes contained in Fent's report, the payroll department issued payments to the specified employees. Id. Fent did not, however, "in the normal course of his job duties, have opportunities from week to week to view" the employees' checks." Id. After distribution of these checks, L-3 then submitted reimbursement requests to the United States. Id.

On May 12, 2003, Fent met with Jack Holland, the operations manager. Id. at 6. During this meeting, Fent viewed per diem checks to be issued to employees for the week of April 29, 2003. Id. Fent claims that the checks "reflected site codes and delivery order codes different from" those he reported for that week. Id. Fent likewise claims that, while in Kuwait, he "learned that checks reimbursing employee per diem for weeks prior to April 29, 2003 also reflected incorrect site codes and delivery order codes." Id. (emphasis in original). Accordingly, he notified the operations

manager and contract field manager of the apparent mistake. Id. Fent alleges that the managers told him "that so long as the employees were being reimbursed for the proper per diem amounts, Fent need not worry that the site codes and delivery order codes appearing on the checks were incorrect." Id. Fent avers that he informed the managers of his belief that L-3 was perpetrating a fraud upon the United States. Id. Later that same day, the operations manager allegedly told Fent to omit site codes and delivery order codes from his report from that point forward. Id.

The following day, Fent chose not to alter his reporting method. Id. Fent asserts that the operations manager "discovered Fent's disobedience and angrily demanded" that Fent resubmit a report, omitting site codes and delivery order codes. Id. Fent refused and told the operations manager that he intended to report L-3's fraud to the proper governmental authorities. Id. at 7. The operations manager "immediately suspended Fent pending termination." Id. Fent alleges that on May 14, 2003, the operations manager drafted a memorandum containing the following language: "I found out later Mr. Fent was interfering with employees [by] working to get statements to back up his future claims and that he was going to file law suit against Raytheon for fraud and anything else he could think of." Id. (alteration in original). L-3 terminated Fent two days later. Id.

Fent claims he subsequently discovered that "his own and the services of others were misclassified while they were working" for L-3 abroad. Id. Fent asserts that L-3 fraudulently classified him as a mechanic, as opposed to an administrative aide, to profit from the pay differential. Id. According to Fent, L-3 "was manipulating job and site codes for the purpose of obtaining funds to which it would not have been otherwise entitled." Id.

**II.**

The FCA authorizes private citizens to bring actions on behalf of the United States. 31 U.S.C. § 3730(b). These actions are known as qui tam actions, with the private citizen or "relator" acting "for the person and for the U.S. government against the alleged false claimant." United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah, 472 F.3d 702, 706 n.3 (10th Cir. 2006) (quoting Vermont Agency of Natural Res. v. United States ex rel. Stevens, 529 U.S. 765, 768 (2000)) (internal quotation marks omitted). The United States must have an opportunity to intervene before the relator may serve the unsealed complaint on a defendant. See 31 U.S.C. § 3730(b)(2). Here, the United States declined to intervene, and so Fent was permitted to proceed with this action.[2] See id. § 3730(b)(4).

As the relator, Fent asserts two claims on behalf of the United States. He also asserts two personal claims for retaliation and wrongful termination. In a previous Opinion and Order (Dkt. # 65), this Court dismissed as to L-3 all counts except Fent's retaliation claim. Remaining are Fent's claims against Raytheon, the parent company of the entity that owns 26.5% of L-3. In Count One, Fent alleges that L-3 and several of its employees conspired to defraud the United States for the purpose of having false or fraudulent claims paid or allowed in violation of 31 U.S.C. § 3729(a)(3). Dkt. # 2, at 8. In Count Two, Fent alleges that L-3 knowingly submitted false and fraudulent claims for payment to an agent of the United States in violation of 31 U.S.C. § 3729(a)(1). Id. at 8-9. In Count Three, Fent alleges that his suspension and termination were retaliatory in violation of 31 U.S.C. § 3730(h). Id. at 9. Finally, in Count Four, Fent alleges wrongful termination in violation of Oklahoma public policy. Id. at 10. Although the complaint does not so plead, Fent argues that

---

[2] If Fent is ultimately successful, he will be entitled to up to 30% of the funds the United States recovers. See id. § 3730(d)(2).

Raytheon is liable for the actions of L-3 because Raytheon is the parent corporation of the entity owning 26.5% of L-3. Dkt. # 59, at 2-3.

Raytheon moves to dismiss Fent's complaint pursuant to Rule 12(b)(6) on the ground that "Fent has not pled any facts indicating that Raytheon committed any independent wrongs." Dkt. # 44, at 1. According to defendant, Fent has failed to state a claim "because Raytheon cannot be held liable for False Claims Act violations or torts committed" by L-3. Id.

### III.

A motion to dismiss is properly granted when a complaint provides no "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." Bell Atlantic Corp. v. Twombly, ___ U.S. ___, 127 S. Ct. 1955, 1965 (2007). In considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court must determine whether the plaintiff has stated a claim upon which relief may be granted. The factual allegations within the complaint "must be enough to raise a right to relief above the speculative level." Id. (citations omitted). "Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Id. at 1969. For purposes of making the dismissal determination, a court must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff. Alvarado v. KOB-TV, L.L.C., 493 F.3d 1210, 1215 (10th Cir. 2007); Moffett v. Halliburton Energy Servs., Inc., 291 F.3d 1227, 1231 (10th Cir. 2002). However, a court need not accept as true those allegations that are conclusory in nature. Erikson v. Pawnee County Bd. of County Comm'rs, 263 F.3d 1151, 1154-55 (10th Cir. 2001) (citations omitted). "[C]onclusory allegations without supporting factual averments are insufficient to state a claim upon which relief can be based." Hall v. Bellman, 935 F.2d 1106, 1109-10 (10th Cir. 1991).

**IV.**

A parent corporation cannot be liable merely because a plaintiff alleges that its subsidiary violated provisions of the FCA. See Hockett v. Columbia/HCA Healthcare Corp., 498 F. Supp. 2d 25, 59-60 (D.D.C. 2007) ("Relator must be able to demonstrate either that [the parent corporation] is liable under a veil piercing or alter ego theory, or that it is directly liable for its own role in the submission of false claims."); United States ex rel. Kneepkins v. Gambro Healthcare, Inc., 115 F. Supp. 2d 35, 39 (D. Mass. 2000) ("Ownership — even total ownership — of a corporation does not by itself impart the corporation's liabilities to the owner, and that rule is not abated simply because the owner happens to be another corporation."); United States ex rel. Tillson v. Lockheed Martin Corp., No. CIV.A. 5:00CV-39-M, 2004 WL 2403114, at *33 (W.D. Ky. Sept. 30, 2004) ("Being a parent corporation of a subsidiary that commits a FCA violation, without some degree of participation by the parent in the claims process, is not enough to support a claim against the parent for the subsidiary's FCA violation."). While the Tenth Circuit has yet to address this issue in an FCA case, it has noted that the tests of agency, alter ego, and instrumentality "are often helpful in dealing with a subsidiary and its parent corporation, when the plaintiff seeks to pierce the corporate veil and hold the parent liable under a federal statute."³ Bristol v. Bd. of County Comm'rs of County

---

³ The Court notes that other district courts have differed in their approach to FCA retaliatory discharge claims. The court in Conner v. Salina Reg'l Health Ctr., Inc., 459 F. Supp. 2d 1081, 1092 (D. Kan. 2006), applied Title VII tests by analogy in resolving whether the parties had an employment or independent contractor relationship. Another court, however, found that in the absence of explicit statutory language to the contrary, "Congress intended 'employer' in § 3730(h) [of the FCA] to have its ordinary, common law meaning." Overton v. Bd. of Comm'rs of Rio Blanco County, No. 05-CV-0186-WDM-PAC, 2006 WL 2844264, at *4-5 (D. Colo. Sept. 29, 2006) (internal quotation marks and citation omitted). Nevertheless, this Court finds that Title VII tests are inapplicable here because the conditions

of Clear Creek, 312 F.3d 1213, 1218 n.5 (10th Cir. 2002) (interpreting the Americans with Disabilities Act). This Court finds, therefore, that the alter ego test is appropriate in this context, where plaintiff alleges FCA liability based solely upon defendant's indirect ownership of 26.5% of the entity which employed plaintiff.

The existence of an employment relationship exposing one to FCA liability is a question of law to be resolved by the courts. United States ex rel. Erickson v. Uintah Special Servs. Dist., 395 F. Supp. 2d 1088, 1101 (D. Utah 2005); see Siewick, 322 F.3d at 740 ("The existence of an employment relationship is a question of law, not of fact; it calls for a legal conclusion."). Federal law controls the veil-piercing question because the FCA provides the basis for a plaintiff's claims. Kneepkins, 115 F. Supp. 2d at 39. The FCA does not, however, address whether a parent corporation may be liable for the fraudulent and wrongful conduct of its subsidiary. See 31 U.S.C. §§ 3729-3730. Thus, courts must apply the veil-piercing test.

The Tenth Circuit has held that the "corporate veil should be pierced only reluctantly and cautiously." NLRB v. Greater Kan. City Roofing, 2 F.3d 1047, 1051 (10th Cir. 1993). A court will pierce the corporate veil whenever a corporation is formed "to perpetrate fraud, evade existing obligations, or circumvent a statute." Id. at 1052 (internal quotation marks and citation omitted). "The federal common law doctrine of piercing the corporate veil under an alter ego theory" is comprised of a two-part test: (i) whether such unity of interest and disregard for the separate corporate identity exists that the personalities and assets of the two entities are indistinct; and (ii)

---

of employment relevant under Title VII have no bearing in this qui tam action. Further, the inquiry at hand extends beyond merely defining who or what may be an "employer" for the purposes of a retaliation claim; here, Fent argues that Raytheon is liable on all four counts simply because of its corporate relationship with L-3.

whether adherence to the corporate fiction would "sanction a fraud, promote injustice, or lead to an evasion of legal obligations." Id.

Here, the Court finds that Fent's complaint fails to state a claim against Raytheon upon which relief may be granted. Fent's complaint suffers from several deficiencies: (1) Fent fails to allege that Raytheon had any direct involvement whatsoever in the alleged false claims, conspiracy, or retaliatory discharge; (2) Fent's entire case against Raytheon rests on his allegation that defendant owns a minority share of L-3;[4] and (3) Fent does not even mention the alter ego elements of unity of interest, disregard for the separate corporate identity, or substantial injustice. The Court concludes, therefore, that Fent has failed to state a claim against Raytheon under Rule 12(b)(6).

Accordingly, the Court finds that Counts I, II, and III should be dismissed without prejudice to the filing of an amended complaint. The Court advises Fent that, if he elects to file an amended complaint, he must plead sufficient detail as to Raytheon and any alleged conspiracy, presentation of false claims, or retaliatory discharge allegation. Count IV is likewise dismissed, but with prejudice, for the reasons set forth in the Court's previous Opinion and Order dismissing Count IV as to defendant L-3. See Dkt. # 65, at 15.

**IT IS THEREFORE ORDERED** that Raytheon Company's Motion to Dismiss (Dkt. # 44) is **granted**. If plaintiff wishes to amend his False Claims Act claims as to this defendant, he must do so in his amended complaint due **November 22, 2007.**

**DATED** this 8th day of November, 2007.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT

---

[4]   Raytheon clarifies in its brief that a subsidiary of Raytheon actually owns 26.5% of L-3. Dkt. # 45, at 2.

8